**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:26-cr-6-JAG** |
| | ) | **Hon. John A. Gibney, Jr.** |
| **TYNELL JONES,** | ) | **Sentencing: October 6, 2026** |
| | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S OBJECTION TO PRE-SENTENCE REPORT, MOTION FOR DOWNWARD VARIANCE, AND POSITION ON SENTENCING**

COMES NOW the defendant, Tynell D. Jones, by counsel, Carolyn V. Grady, and Javionté Johnson, files this Position on Sentencing pursuant to Rule 32 of the Federal Rules of Criminal Procedure and Section 6A1.3 of the advisory United States Sentencing Guidelines ("U.S.S.G." or "Guidelines"). Counsel has reviewed the Presentence Report ("PSR") and all corrections have been made and the objection as outlined below. This Position outlines why this Court should sentence Mr. Jones below the Sentencing Guidelines because of his traumatic background and history.

As summarized below, Mr. Jones objects to the calculation of the Sentencing Guidelines as contained in paragraphs 15 to 25 of the PSR. Currently, the Guidelines are calculated to suggest a sentencing range of 57 to 71 months and a fine of at least $15,000. PSR ¶ 88. Mr. Jones objects to the four-level enhancement of his offense level under U.S.S.G. § 2K2.1(b)(7)(B). PSR ¶ 17. If the Court overrules the objection, Mr. Jones requests a downward sentence of 46 months as the facts of the case and Mr. Jones' background and characteristics justify the variance.

If the Court sustains the objection, the Total Offense Level would become 17, and with a Criminal History Category of IV, the Sentencing Guidelines would then suggest a range of 37 to

46 months, and a fine of at least $10,000. Due to his financial condition, Mr. Jones requests that he not be fined as a part of his sentence.

After consideration of the objection, all of the evidence, this sentencing position and the sentencing factors of 18 U.S.C. § 3553(a), Mr. Jones requests that the Court impose a below guidelines sentence of no more than 46 months, as this is sufficient and not greater than necessary to achieve the goals and objectives of 18 U.S.C. § 3553(a).

In support of this request, Mr. Jones submits the following:

## **Case History**

On January 20, 2026, a Grand Jury indicted Mr. Jones, charging him with possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1). PSR ¶ 1; ECF No. 1. Mr. Jones had previously been charged for this same conduct by the City of Richmond as outlined in paragraph 59 of the PSR. Mr. Jones has been incarcerated since his arrest on October 4, 2025. PSR at 1.

On February 9, 2026, Mr. Jones made his first appearance on the Indictment before United States Magistrate Judge Summer L. Speight, who ordered that Mr. Jones be temporarily detained pending a detention hearing, and appointed counsel to represent Mr. Jones. ECF Nos. 6, 9. On February 12, 2026, a detention hearing was held before United States Magistrate Judge Summer L. Speight, wherein, after hearing arguments from the parties, Mr. Jones was ordered to be held without bond pending further proceedings. ECF Nos. 11, 12. Also on February 12, 2026, an arraignment was held before Senior United States District Judge Henry E. Hudson, wherein Mr. Jones pleaded not guilty to the Indictment, and a trial was set for April 21, 2026. ECF No 13.

On May 26, 2026, Mr. Jones pled guilty to the Indictment and sentencing was scheduled for September 15, 2026. ECF Nos. 17, 19. The sentencing was then continued to September 23, 2026, and later to October 6, 2026. ECF No. 26.

**Legal Framework**

While this Court must still correctly calculate the guideline range, *Gall v. United States*, 552 U.S. 38, 49 (2007), it may not treat that range as mandatory or presumptive, *id*. at 51; *Nelson v. United States*, 555 U.S. 350, 352 (2009), but must treat it as "one factor among several" to be considered in imposing an appropriate sentence under 18 U.S.C. § 3553(a). *Kimbrough v. United States*, 552 U.S. 85, 90 (2007). The Court must "consider all of the § 3553(a) factors," "make an individualized assessment based on the facts presented," *Id*. at 49-50, and explain how the facts relate to the purposes of sentencing. *Id*. at 53-60; *Pepper v. United States*, 131 S. Ct. 1229, 1242-43 (2011). The Court's "overarching" duty is to "'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing." *Id*. at 101; *Pepper*, 131 S. Ct. at 1242-43. After listening to the parties' arguments as to the appropriate sentence, a sentencing judge must look to the other sentencing factors delineated under 18 U.S.C. § 3553(a) to determine whether they support the sentence requested by the parties. *See Gall*, 552 U.S. at 49.

The other factors courts must consider when imposing the appropriate sentence are: the nature and circumstances of the offense and the history and characteristics of the defendant, 18 U.S.C. § 3553(a)(1); the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, protect the public, and provide the defendant with appropriate correctional treatment, *id*. at § 3553(a)(2); the kinds of sentences available, *id*. at § 3553(a)(2); the need to avoid unwarranted disparity among defendants with similar records and conduct, *id*. at 3553(a)(6); and the need to provide restitution to any victims of the offense, *id*. at § 3553(a)(7). The overarching admonition of 18 U.S.C. § 3553(a) is that courts are obliged to "impose a sentence sufficient, but not greater than necessary to comply with the purposes set forth in paragraph (2) of this subjection."

**<u>Objection of Four Level Enhancement under USSG §2K2.1(b)(7)(B)</u>**

The PSR includes a four-level enhancement under U.S.S.G. § 2K2.1(b)(7)(B), alleging that Mr. Jones "used or possessed any firearm or ammunition in connection with another felony offense; or possessed or transferred any firearm or ammunition with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense…." PSR ¶ 17. Mr. Jones objects to this enhancement as applied in this case.

Mr. Jones has only been charged with one felony, the one to which he pled guilty. The government cannot prove the enhancement that Mr. Jones committed any additional felony in connection with his possession of a firearm. Specifically, any alleged felonious conduct beyond the possession of the firearm is either justified or excused by Mr. Jones' claim of self-defense, including any allegations of shooting into an occupied dwelling, a vehicle, or attempted murder/malicious wounding.

The use of potentially deadly force against another can be justified or excused by a claim of self-defense. If a defendant "reasonably fear[s] death or serious bodily harm to himself…" then he may use deadly force to repel the potential threat to his life. *McGhee v. Commonwealth*, 219 Va. 560, 562, 248 S.E.2d 808, 810 (1978).

> It is not essential to the right of self-defense that the danger should in fact exist. If it reasonably appears to a defendant that the danger exists, he has the right to defend against it to the same extent, and under the same rules, as would obtain in case the danger is real. A defendant may always act upon reasonable appearance of danger, and whether the danger is reasonably apparent is always to be determined from the viewpoint of the defendant at the time he acted.

As is clear from the discovery provided by the United States, other individuals were discharging firearms within a two-block radius of where Mr. Jones was observed by Richmond police officers. *See*, *e.g*., Exhibit 1, Clip from "Tsunami_39-1 - St. Johns and Coutts.mp4" at 00:28, Time Stamped 10/04/2025 20:38:36. In fact, Mr. Jones initially and repeatedly told the

Richmond police officers that he believed these individuals were shooting at him and were trying to kill him. *See* Exhibit 2, “gun_fire.mp4”, Time Stamped 20:43:22–20:43:45. Mr. Jones was shooting the weapon in self-defense.

Specifically, and contrary to the United States’ arguments, the discovery reveals that at approximately 8:38 PM, an unknown individual, who is not Mr. Jones, was observed by a Tsunami camera firing what appears to be a handgun at someone off-camera at least three times. Exhibit 1, Clip from “Tsunami_39-1.mp4”. This man was wearing a black hoodie and gray pants. A few moments later, another unidentified individual appears on the same camera feed and discharges his firearm at the first individual. *Id.* at 00:38 (Time Stamped 20:38:46) While it is too dark and too distant to determine who was shooting, muzzle flashes can be seen coming from the individual returning fire at the first shooter. *Id.* Richmond Police later canvassed the area visible on Tsunami_39-1.mp4 and found four shell casings from a .45 caliber handgun, believed to have been fired at Mr. Jones by these unidentified individuals. PSR ¶ 7.

Approximately three minutes after these unidentified individuals are seen engaging in a shootout, Mr. Jones appears for the first time on the Tsunami cameras. Mr. Jones was running down Charity Street towards Brook Road and into an alley with a firearm in his hands. *See* Exhibit 3, Clip from “Tsunami_35-Monsoon.mp4” at 00:09, Time Stamp 20:41:42. Two minutes later, the camera shows Mr. Jones running back the way he came, firing three shots towards a group of men who had appeared from around the corner, one wearing a black hoodie and a gray hat. *See id.* at Time Stamp 20:43:04; *See also* Exhibit 4, Clip from “Tsunami_35-03.mp4” at 00:02, Time Stamped 20:43:08.

One of these men appears to spot Mr. Jones running down the street and then turned back and literally pointed out Mr. Jones to the other two behind him. Exhibit 4 at 00:12, Time Stamp

20:43:00. A careful review of the surveillance footage from this moment shows that two men emerge from around the corner of the building *after* Mr. Jones began shooting at them. *Id.* at 00:22, Time Stamp 20:43:10. In fact, they only appear to run away after Mr. Jones has stopped shooting in their general direction and once they noticed the Richmond Police vehicle approach. The first thing that Mr. Jones said to Richmond police officers when they arrested him was that he was defending himself from nearby unidentified individuals who were shooting at him and trying to kill him. Mr. Jones explained to the officers that he had been shot several times before, and that he was scared that these individuals were going to shoot him again. *See* Exhibit 5, Clip from "RANDOM_GUNFIRE_1000_ST_JOHN_ST_RICH_@GILPIN_COURT_MANAGEMENT_OFFICE-7.mp4"; Exhibit 6, Clip from "Gilpin_Court_Weapons_Violation_Arrest.mp4".

The government's own evidence clearly shows that Mr. Jones had *already* been shot at by armed men when he discharged his firearm. Video evidence corroborates this, with small muzzle flashes from unknown individuals' handguns observed at 8:38 PM. These individuals can be seen shooting first at an individual off camera, who only returned fire *after* being shot at first. When Richmond Police encountered Tynell Jones, it was nearly five minutes after the unidentified men in Exhibit 1 ("Tsunami_39-1.mp4") entered a shootout. Mr. Jones can be seen fleeing from the area where these unidentified shooters were. Further, when Mr. Jones fired his weapon in front of Richmond Police, he was being followed and approached by a group of unidentified men who appear similar to those individuals shooting handguns at 8:38 PM. Right before Mr. Jones comes into view of the camera, an unidentified man can be seen pointing out Mr. Jones to two individuals who were waiting around the corner. *See* Exhibit 4, Clip from "Tsunami_35-03" at 00:12, Time Stamp 20:43:00. Mr. Jones reasonably believed that this person was pointing him out to these two other individuals for the purposes of shooting him as he passed by—the discovery footage seems

to show that they initially attempted to take up firing positions against Mr. Jones and only retreated once they noticed the Richmond Police officers approaching their location.

In summary, Mr. Jones objects to the application of the four additional levels under U.S.S.G. § 2K2.1(b)(7)(B) under the theory that Mr. Jones' discharging of a firearm constitutes a separate felony offense for the purposes of U.S.S.G. § 2K2.1(b)(7)(B). Mr. Jones is adamant that any discharge of the firearm he possessed was done in justified or excusable self-defense due to his reasonable apprehension of imminent death or grave bodily injury at the hands of the unidentified individuals in Gilpin Court who were shooting at him.

**This Court Should Deny the Government's Motion for Upward Variance**

The United States has requested that this Court depart upwards from the current Sentencing Guidelines. However, the government's argument relies on a flawed and mistaken view of the facts and circumstances of the offense and ignores Mr. Jones' significant and mitigating history of tragedy and mental health struggles. When properly considering the relevant factors, circumstances, and history under 18 U.S.C. § 3553(a), it is inappropriate to deviate upwards from the Sentencing Guidelines. Based on the arguments in this Motion, this Court should deny the government's Motion for Upward Variance.

**Argument under 18 U.S.C. § 3553(a)**

**Given the Nature and Circumstances of Mr. Jones' Offense and His History and Characteristics, the Sentence Requested Is Sufficient, But Not Greater than Necessary to Satisfy the Purposes of Sentencing.**

In enacting the Sentencing Reform Act ("SRA"), Congress did "not favor []one purpose of sentencing over another," except that rehabilitation was not to be a reason to impose a sentence of incarceration. *See* S. Rep. No. 98-225, at 67 (1983). Rather, "each of the four stated purposes should be considered in imposing sentence in a particular case," and "one purpose of sentencing

may have more bearing on the imposition of sentence in a particular case than another purpose has." *Id.* at 68. In choosing what kind of sentence to impose, the court must consider all of the purposes and factors set forth in § 3553(a) and impose a sentence that is sufficient but not greater than necessary to satisfy the purposes of sentencing.

**1. Nature and Circumstances of Mr. Jones' Offense**

As discussed above and at length in the PSR, Mr. Jones admits that he possessed the firearm in what amounted to a shootout in Gilpin Court. Mr. Jones is adamant that he discharged his firearm only in self-defense. Contrary to what the government alleges, Mr. Jones can only be seen discharging a firearm in a single video, where he fired at unidentified men who had spotted him running away from them and can be seen pointing him out. These men only retreated away from Mr. Jones after they saw the Richmond Police vehicle arrive on scene, not because Mr. Jones was firing at them. This occurred nearly five minutes after unidentified individuals engaged in a shootout nearby. Mr. Jones, who was wearing bright blue pants and a bright blue jacket that night, cannot be identified in any video of the initial shootout—those men were wearing dark clothing. Mr. Jones was cooperative after he saw the police as he followed their commands and laid down on the sidewalk and laid down his weapon. Once charged and brought to federal court, Mr. Jones immediately took responsibility for his actions and promptly pleaded guilty.

**2. Tynell Jones' History and Characteristics**

Tynell Jones has lived a life influenced by overwhelming loss and disruption. Tynell was born in 1992 to the unwed union of Elaine Jones and Renaldo Lightfoot. PSR ¶¶ 55, 66. Elaine Jones was only a teenager, aged 18, when Tynell was born, and she raised him in her mother's home with her mother and sister, Janice Alston. According to Mrs. Alston, Mr. Jones' father was involved in his life at a very early age. Tynell was a "daddy's child" and hung around his father.

*See* 3:17-cr-111-HEH-1, ECF No. 45-3 (Notes from January 5, 2018, Interview of Janice Alston, hereinafter "Notes"). Tynell's father provided financial support and took care of Mr. Jones at times while his mother worked. PSR ¶ 66.

Tynell was approximately 4 years old when he experienced his first significant loss and disruption: his father was arrested on charges involving murder and drugs. Renaldo Lightfoot received a life sentence on September 29, 1998. PSR ¶ 62. This was stunning for a young boy who was just getting to know his father. "The sentencing and confinement of a parent, similar to other sudden and unexpected events over which families and children have no control, amount to a family crisis. Children dealing with parental incarceration may share some of the same symptoms as children experiencing other traumatic events and may undergo similar phases in coping with those separations and events as well"[1] The sudden and permanent loss of his father to incarceration was a major emotional and financial loss for Tynell as he never visited his father in prison. PSR ¶ 66. After his father's arrest and incarceration, Tynell clung to his mother and grandmother. *See* 3:17-cr-111-HEH-1, ECF No. 45-3 ("Notes").

Once his father was removed from his life, Tynell's mother struggled to maintain a stable environment for her family. While his mother maintained employment, at times she relied on food stamps and public housing to provide for Tynell and his younger sister. PSR ¶ 66. At different times, his mother had boyfriends in the home, but these men did not provide financial support for the family. *Id.* Instead, these men brought domestic violence into the house, much of which was witnessed by young Tynell. *Id.* The police were called to the home because of some of the

---

[1] Hairston, C.F. (Oct. 2007). Focus on children with incarcerated parents: An overview of the research literature. A report prepared for the Annie E. Casey Foundation. Page 18. https://repositories.lib.utexas.edu/bitstream/handle/2152/15158/AECasey_Children_IncParents.pdf?sequence=2

altercations which in turn clearly had a detrimental impact on him. "Experts say the effects of witnessing violence is the same as experiencing it. These children are much more likely to suffer as adults from addiction and other health problems and become victims or perpetrators of violence".[2] It is clear from the history just how this this affected Tynell.

Within three years of the loss of his father to prison, young Tynell was receiving intensive treatment for major mental health concerns. As the PSR indicates, at the age of nine, Tynell was admitted to CJW Medical Center for five days due to aggressive behaviors and suicidal ideations following a referral from Richmond Behavioral Health Authority (RBHA). PSR ¶ 76. Mrs. Alston recalls that Tynell received services through RBHA when he was a child, and that Tynell had problems with his teachers and could not sit still. *See* 3:17-cr-111-HEH-1, ECF No. 45-3 ("Notes"). Shockingly, this was Tynell's third admission for mental health treatment, having been previously admitted twice to the Virginia Treatment Center for Children. PSR ¶ 76. A urinalysis submitted by Tynell at CJW was within normal limits, but his lead level was 3. *See* 3:17-cr-111-HEH-1, ECF No. 43 (PSR), ¶ 68. No child should have any lead in their blood stream due to the known effects of lead. According to the CDC, "[p]rotecting children from exposure to lead is important to lifelong good health. No safe blood lead level in children has been identified. Even low levels of lead in blood have been shown to affect learning, ability to pay attention, and academic achievement."[3]

---

[2] Vargas, T. March 8, 2014. 'Don't kill her!' Children who witness domestic violence carry lifelong scars. The Washington Post. https://www.washingtonpost.com/local/dont-kill-her-children-who-witness-domestic-violence-carry-lifelong-scars/2014/03/08/d30cc6bc-9d83-11e3-b8d8-94577ff66b28_story.html?utm_term=.5db684625529

[3] CDC "Preventing Childhood Lead Poisoning", available at https://www.cdc.gov/lead-prevention/prevention/index.html (Last updated June 12, 2024)

The only information that both the probation officer and counsel for Mr. Jones could obtain from Richmond Public Schools was that Tynell received special education services during the 2006-2007 school year and that an IEP existed and was implemented. PSR ¶ 82. During a 2011 mental health assessment referred to in paragraph 77 of the PSR, Tynell discussed the difficulties he had in school as a child: "He further revealed he always had a problem focusing and had problems learning in school. He had been seen by a school psychologist and reported he was diagnosed with 'ADHD' and 'ED.' He explained he thought 'ED' meant he was learning disabled. He acknowledged problems with learning and not understanding what teachers were talking about." PSR ¶ 77.

As is clear from the PSR, on February 26, 2003, Tynell Jones experienced extreme loss, violence and disruption again in his life when, at age 11, he witnessed the violent death of his mother, his only caretaker, at the hands of her boyfriend Reginald Johnson. PSR ¶ 67. According to Mrs. Alston, Tynell's mother, Elaine Jones (her sister), began dating Reginald Johnson soon after he returned home from prison. *See* 3:17-cr-111-HEH-1, ECF No. 45-3 ("Notes"). Their relationship moved quickly, and Elaine did not know much about him. *Id.* Earlier in the week of her death, Reginald followed Elaine and broke into her apartment. *Id.* He also showed up at Elaine's job and her supervisor threatened to fire her if Reginald continued to come to her job because he caused such a disruption. *Id.* Reginald threatened to kill Elaine. He previously shot at Elaine and Mrs. Alston believes young Tynell was in the car with his mother when this occurred. *Id.* Elaine was clearly afraid of Reginald, and that kind of tension and fear is detrimental to stability in the home. *Id.*

Mrs. Alston noted that Tynell and his 2-year-old sister were in bed with their mother when her boyfriend came into the room and shot her. *Id.* Tynell tried to "attack" Mr. Johnson by jumping

on him after the shooting. PSR ¶ 67. Instead of hurting or stopping the man who just shot his mother, Tynell waited with his dying mother prior to the arrival of the emergency medical technicians. *Id.* Sadly, she died, essentially in his arms, before help could arrive. *Id.* Mr. Johnson fled the scene and later committed suicide as police came close to his car.[4] There was no closure of a murder trial nor any counseling for Tynell.

According to family violence research, "[t]he death of a parent is a major life stressor. If it occurs during one's childhood or adolescence, the loss is even more extreme. The extent of trauma is compounded if the death is the consequence of a murder committed by another significant other, and in the child's presence." The stress of witnessing domestic violence can also compound the trauma experienced from the death of a parent.[5]

After his mother's murder, Tynell's grandmother decided he would live with her oldest son. *See* 3:17-cr-111-HEH-1, ECF No. 45-3 ("Notes"). Mrs. Alston did not know if young Tynell received any mental health counseling to address the trauma and loss he experienced after his mother's death. Tynell lived with his uncle for approximately 3 years and then lived with his paternal half-brother and his mother Ms. Mealy. PSR ¶ 69. It was around this time that Tynell began to have contact with his father via telephone, as his father called Ms. Mealy's home. Tynell did not have any contact with his father while he lived with his uncle. *See* 3:17-cr-111-HEH-1, ECF No. 45-3 ("Notes").

---

[4] Kunkle, F. (Feb. 26, 2003). Suspect in 2 Va. slayings, surrounded, kills self. The Washington Post. https://www.washingtonpost.com/archive/local/2003/02/26/suspect-in-2-va-slayings-surrounded-kills-self/b7165155-036b-41b9-95f5-9942404cd8ea/?utm_term=.c0badadfa30b

[5] Lewandowski, L. A., McFarlane, J., Campbell, J. C., Gary, F., & Barenski, C. (2004). "He killed my mommy!" Murder or attempted murder of a child's mother. *Journal of Family Violence*, 19(4), 211-220.

Witnessing his mother's violent murder had a profound impact on Tynell, a young boy who had already struggled with mental health issues for years. According to the literature on childhood trauma, as outlined below, it appears that Tynell was profoundly affected by this trauma:

> For some children and adolescents, responses to traumatic events can have a profound effect on the way they see themselves and their world. These children may experience important and long-lasting changes in their ability to trust others, their sense of personal safety, their effectiveness in navigating life challenges, and their belief that there is justice or fairness in life. Traumatized children may develop changes in behavior that are often referred to as externalizing problems or acting out. They may become involved in fights or other conflicts with peers, have difficulty interacting with authority figures, become socially isolated or withdrawn, develop poor school attendance, and begin using illicit substances. They may also experience changes in their emotional and psychological functioning, referred to as internalizing problems, such as depression or anxiety. These internal changes may be more difficult for others to detect than external changes but can still cause significant impairment in functioning.[6]

Some children experience traumatic grief after the death of a loved one when the child perceives the death as traumatic. "Childhood traumatic grief is distinct from the normal bereavement process and PTSD, but it shares features of both. The distinguishing feature of childhood traumatic grief is that trauma symptoms interfere with the child's ability to navigate the typical bereavement process"[7] Difficulties specific to childhood traumatic grief include:

- Intrusive memories about the death: These can appear through nightmares, guilt, or self-blame about how the person died or recurrent or intrusive thoughts about the horrifying manner of death.
- Avoidance and numbing: These can be expressed by withdrawal, the child acting as if not upset, or the child avoiding reminders of the person, the way she or he died, or the event that led to the death.
- Physical or emotional symptoms of increased arousal: These can include irritability, anger, trouble sleeping, decreased concentration, drop in grades, stomachaches, headaches, increased vigilance, and fears about safety for oneself or others. (*Id.* at 7).

---

[6] Goodman, R. F. Cohen, J., Epstein, C., Klierhermes, M., Layne, C., Macy., & Ward-Wimmer, D. (2004). Page 6. Childhood traumatic grief educational materials. The National Child Traumatic Stress Network, Childhood Traumatic Grief Task Force, & Educational Materials Subcommittee. http://www.nctsn.org/sites/default/files/assets/pdfs/childhood_traumatic_grief.pdf

[7] Goodman, page 7.

Children likely have an increased risk of traumatic grief when they already experienced life adversities or experience life adversities because of the death.[8] Tynell experienced difficult life circumstances prior to his mother's murder with the incarceration of his father and his mental health concerns as well as following his mother's murder, such as he had to leave his home and younger sister to live with an uncle. According to Tynell's August 9, 2011, mental health assessment requested by probation, "[Mr. Jones] described a childhood characterized by chaos, instability, violence and death. He discussed witnessing his mother's murder, living with various relatives and changing residences several times for most of his life." PSR ¶ 77. The evaluator also reported, "He did admit to experiencing intermittent nightmares and intrusive thoughts during the day about his mother's murder, which he witnessed. He acknowledged feelings of intense anger following these periods." *Id.* According to Mrs. Alston, Tynell experienced another significant loss when his maternal grandmother passed away in 2006, as Tynell was very close with his grandmother. *See* 3:17-cr-111-HEH-1, ECF No. 45-3 ("Notes").

As an adult, Mr. Jones continued to struggle with mental health concerns. PSR ¶ 78. The evaluator of the August 9, 2011, mental health assessment noted Tynell displayed behaviors consistent with ADHD. According to the Diagnostic and Statistical Manual of Mental Disorders (5th ed.; DSM-5; American Psychiatric Association, 2013),

> ADHD is a neurodevelopmental disorder defined by impairing levels of inattention, disorganization, and/or hyperactivity-impulsivity. Inattention and disorganization entail inability to stay on task, seeming not to listen, and losing materials, at levels that are inconsistent with age or developmental level. Hyperactivity-impulsivity entails overactivity, fidgeting, inability to stay seated, intruding into other people's activities, and inability to wait—symptoms that are excessive for age or developmental level. In childhood, ADHD frequently overlaps with disorders that are often considered to be 'externalizing disorders,' such as oppositional defiant disorder and conduct disorder. ADHD often persists into adulthood, with resultant

---

[8] Goodman.

> impairments of social, academic and occupational functioning (American Psychiatric Association, 2013, p. 61).

The DSM-5 further explains:

> In adults, hyperactivity may manifest as extreme restlessness or wearing others out with their activity. *Impulsivity* refers to hasty actions that occur in the moment without forethought and that have high potential for harm to the individual…. Impulsivity may reflect a desire for immediate rewards or an inability to delay gratification. Impulsive behaviors may manifest as social intrusiveness (e.g., interrupting others excessively) and / or as making important decisions without consideration of long-term consequences…" (American Psychiatric Association, 2013, p. 61)

So not only was Tynell dealing or not dealing with this mental health disorder but, as it was determined during the mental health assessment, Tynell displayed features of Post Traumatic Stress Disorder and Intermittent Explosive Disorder.

Not only has Tynell witnessed trauma inflicted on others, and suffered the consequences, but trauma affected his own life when he was shot multiple times on December 10, 2011. The PSR indicates that Tynell had attended a house party and someone who rode by the home on a bike shot him multiple times while he was on the front porch. PSR ¶ 72. During Tynell's lengthy hospital stay, he began to refuse treatment, and this behavior prompted a psychiatric evaluation. PSR ¶ 73. The evaluator deemed him competent and concluded that his behavior "was likely secondary to immature, maladaptive coping mechanisms. His disposition was mostly social in nature and would require collaboration with social workers, the defendant and his family." *Id.* Since Tynell's life was unstable before and afterwards, and had little guidance, it is no wonder that he was not able to deal with this traumatic experience either.

According to Mrs. Alston, after Tynell was shot, his trust level "minimized a great deal." He did not know whom to trust. Tynell was concerned about his surroundings, who he talked to, and where he went. Mrs. Alston was not sure if anyone was prosecuted for shooting Tynell. After

the hospital released Tynell to a hotel with food and clothing, he stayed with Mrs. Alston's father who nursed Tynell back to health. (*See* "Notes"). Tynell continues to experience abdominal pain from the injury. PSR ¶¶ 73, 75. After Tynell was shot, he reportedly would take two to three opiate pills twice a week and also used marijuana at least monthly, which use had begun when he was only 12 years old. PSR ¶ 79. However, Mr. Jones has reportedly ceased use of both of these substances after being released from BOP custody in 2025. PSR ¶ 80.

In summary, all of his background and characteristics shows that Tynell is an injured person—physically, mentally, and emotionally. He desperately needs help and not just a lengthy incarceration. Tynell's remaining family members love and support him, especially his aunt Mrs. Alston, his uncle James Alston, Jr., his grandfather William E. Jones, Sr., and his sister, Rael Johnson. All four of these family members have submitted character letters in support of Tynell to this Court, and they join Tynell in requesting a period of shorter period of incarceration. *See* Exhibits 7-10. Tynell's family all support him getting the help that he needs to be a productive citizen upon his release and agree that a lengthy period of incarceration will not accomplish this goal.

What might be concerning to the Court is Mr. Jones' criminal history. Mr. Jones' first contact with the criminal justice system was when he committed a robbery when he was 14 years old. PSR ¶ 27. As the law required, he was treated as an adult and was committed to the Department of Juvenile Justice for a 3-year sentence. *Id.* There was no attempt at helping him but rather, he was taken off the street, away from whatever remaining family he had and was warehoused for three years in an overcrowded and ineffective juvenile system. After this, Tynell struggled with substance abuse and was convicted of heroin, cocaine, and Xanax possession, all at the age of 21. PSR ¶¶ 32-34. Tynell was convicted in this Court in 2018 of Possession of a Firearm by a Felon

and sentenced to 78 months in BOP custody. *See* 3:17-cr-111-HEH-1, ECF No. 55 (Judgment). While on Supervised Release, Tynell relapsed into substance abuse and faced several Supervised Release Violations for positive drug screens. *See* 3:17-cr-111-HEH-1, ECF Nos. 108, 114, 125, 127, 139, 145, 147, 148, 150, 151, 160. It is apparent that his childhood traumas and his substance use disorder is what drove much of his criminal behavior.

Clearly, Tynell Jones has made mistakes relating to the innumerable tragedies and hardships he has faced over the last few decades of his life. However, what sets the Tynell Jones of 2026 apart from the Tynell Jones of the past is the recent birth of his daughter, T.E.S.J., on May 29, 2026. Bearing the name of Tynell's mother, T.E.S.J. is Mr. Jones' reason for making much-needed changes in his life. Tynell has not been able to see his newborn daughter since his arrest for this offense in October of 2025, and regrets that his actions have deprived him of being present in his daughter's life. Mr. Jones does not want to be like his own father, who was not in Tynell's life due to incarceration, and plans to take his new responsibilities as a father seriously upon his release.

**3. Need for Just Punishment in Light of the Seriousness of the Offense**

Section 3553(a)(2)(A) requires a sentencing court to impose a sentence that reflects the seriousness of the offense, promotes respect for the law, and provides just punishment. In this case, Tynell Jones has a Criminal History Category ("CHC") of IV, and the suggested guideline range is 57 to 71 months. PSR ¶¶ 42, 88. A sentence at the low end of the guidelines is greater than necessary given his traumatic history and mental health issue as outlined in the PSR. However, if Mr. Jones' objection to the four-point enhancement is granted, then his guideline range would be only 37 to 46 months. As argued throughout, a sentence of 46 months would better suit Tynell, his

family, and his community, whichever way the Court arrives at this number – through the objection or the issuance of a downward variance.

**4. Need for Adequate Deterrence**

Section 3553(a)(2)(B) requires a sentencing court to impose a sentence that affords adequate deterrence to criminal conduct. A 46-month sentence is a significant period of time and will thus provide plenty of disincentive to return to prison.

This federal prosecution has made a serious impression on Tynell as evidenced by his willingness to plead guilty and take responsibility for his actions. Additionally, Tynell was unable to be present at the birth of his daughter due to this prosecution, and any sentence imposed on him as a result will deprive him further of the opportunity to be present in her life during her most formative years. As a new father, every month of incarceration Tynell will face is twice as difficult for him because it keeps him from his daughter and from his family. This level of punishment and deterrence is something that Tynell has never experienced before, and it has affected him in a way that no previous incarceration ever has. Therefore, a sentence of greater than 46 months does nothing to increase that deterrence already in place as a result of this prosecution.

**5. Need to Protect Society**

Section 3553(a)(2)(C) requires a sentencing court to impose a sentence that protects the public from other crimes of the defendant. A sentence of 46 months will certainly protect society and together with programming and counseling, Tynell will be less of a danger to society upon his release. As is obvious from this Position, Mr. Jones is in great need of services that will be provided, thereby increasing his chances of rehabilitation during this sentence: a chance he never really had in an overcrowded juvenile detention center. Tynell needs help and not just incarceration.

**6. The Guidelines**

Section 3553(a)(3) requires the court to consider the kinds of sentences available. In this case, Mr. Jones' guidelines are contained in paragraphs 87 to 88 of the PSR. Those guidelines start with a base offense level of 20 due to type of firearm possessed when combined with his criminal history, most of which is old enough to not warrant inclusion in the calculation of his Criminal History Category. *See* PSR ¶¶ 29-42, 89. As outlined above, Mr. Jones objects to the four-level enhancement under USSG § 2K2.1(b)(7)(B). Mr. Jones pled guilty quickly and has taken full accountability for his actions, which constitute a three-level reduction. PSR ¶¶ 23-24. The guidelines consider all of the offense characteristics, and there is no need to sentence outside of that range and no need for this enhancement.

**7. The Need to Provide Medical and Vocational Assistance**

This Court is charged with considering the medical, vocational, and educational needs of the defendant before issuing the sentence and the court cannot lengthen any sentence to provide such treatment or training. In this case, Tynell clearly needs both vocational and educational training while serving this sentence. First, the PSR clearly indicates that Tynell was in special education classes and needs to further his educational goals while serving this sentence. PSR ¶ 82. Second, some medical attention is necessary as the PSR indicates that he was shot in multiple places in 2011 and still suffers from pain and discomfort. PSR ¶ 73. Third, Tynell also likely suffers from PTSD because of that traumatic experience in combination to being next to his mother when she was violently murdered. PSR ¶¶ 67, 77. He needs some real help with the PTSD that is rampant in his life. Paragraphs 76 to 78 of the PSR indicate the difficulties and mental health issues that he suffered from the age of nine to the present. He certainly needs some help and counseling during this incarceration to try to repair the emotional damage he suffered as a young teen. Finally,

Tynell has had a drug problem since age 12 and needs the assistance of substance abuse counselors to battle his addiction to pain killers. PSR ¶ 79. Lastly, the birth of Tynell's daughter has now given him a reason to prioritize healing, rehabilitation, and personal growth so that when he is released, he can be a positive presence in her life. Mr. Jones requests that the Court recommend to the Bureau of Prisons that he be designated to a facility that offers those kinds of rehabilitative programs, such as FCI Petersburg or FCI Butner in North Carolina.

WHEREAS, for the foregoing reasons, Mr. Jones requests that he be sentenced to no more than 46 months' incarceration.

Respectfully Submitted
TYNELL D. JONES

By: /s/

Carolyn V. Grady
Assistant Federal Public Defender
Va. Bar No. 30445
Attorney for Tynell Jones
Office of the Federal Public Defender
Eastern District of Virginia
701 E. Broad Street, Suite 3600
Richmond, VA 23219
(804) 565-0855 (direct)
(804) 800-4214 (fax)
Carolyn_Grady@fd.org

/s/

Javionté D. Johnson
New York Bar No. 5720214
Attorney for Tynell Jones
Assistant Federal Public Defender
Office of the Federal Public Defender
Eastern District of Virginia
701 E. Broad Street, Suite 3600
Richmond, VA 23219
(804) 565-0832 (direct)
(804) 800-4214 (fax)
Javionte_Johnson@fd.org